DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JAYLEN TYRUS EUBANKS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2025-1698

[June 17, 2026]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Lorena V. Mastrarrigo, Judge; L.T. Case No. 062024CF005748A88810.

Daniel Eisinger, Public Defender, and Ethan Ross Goldberg, Assistant Public Defender, West Palm Beach, for appellant.

James Uthmeier, Attorney General, Tallahassee; Jeffrey Paul DeSousa, Acting Solicitor General, Nathan Andrew Forrester, Chief Deputy Solicitor General, and Christine Kimberly Pratt, Assistant Solicitor General, Office of the Attorney General, Tallahassee; and Consiglia Terenzio, Chief Assistant Attorney General, West Palm Beach, for appellee.

Harold Fernandez Pryor Jr., State Attorney, and Joel Michael Silvershein, Assistant State Attorney, Fort Lauderdale, for Amicus Curiae State Attorney's Office of the Seventeenth Judicial Circuit of Florida.

LEVINE, J.

Can law-abiding adults, aged 18 to 20, be prohibited from exercising their Second Amendment rights to self-defense available to other law-abiding adults? The plain text of the Constitution and our country's history and traditions say no. Restricting 18- to 20-year-olds—members of the same "political community" as other law-abiding adults—from rights to self-defense would make the Second Amendment a "second-class" right. Thus, section 790.06(2)(b), Florida Statutes , which disqualifies law-abiding adults aged 18 to 20 from being able to satisfy the criteria for concealed carry that is available to other law-abiding adults, is unconstitutional. We, therefore, find that this statutory provision is

facially unconstitutional as it relates to 18- to 20-year-olds.[1]

## I. Facts

In 2024, an officer responded to a call that a person had pulled out a handgun in the direction of a vehicle.  The police detained appellant, who matched the caller's description.  The officer patted appellant down and found an unholstered handgun on appellant's waist.  Appellant, who was 18 at the time, was charged with carrying a concealed firearm, in violation of section 790.01(3), as well as the improper exhibition of a firearm.  Appellant was not charged with any violation of section 790.053, the ban on openly carrying a firearm.

Appellant moved to dismiss the charge of carrying a concealed firearm, arguing that the categorical ban on those aged 18 to 20 from carrying a concealed firearm was violative of the Second Amendment.  The State Attorney's Office argued that there was "nothing inherently unconstitutional about requiring a person to qualify for a permit to carry a concealed firearm or carefully restricting a few citizens from carrying a concealed firearm because of a concern for the public safety." (emphasis omitted).

The trial court denied the motion to dismiss, finding that the licensing provisions for concealed carry are designed to ensure that only law-abiding, responsible citizens are permitted to carry concealed firearms.[2]  Appellant then pled nolo contendere to the charges of carrying a concealed firearm and improper exhibition of a firearm, reserving his right to appeal as to the dispositive motion to dismiss the concealed carry charge.  From

---

[1] We do not consider appellant's challenge under the Florida Constitution because he did not raise such a challenge in the trial court and did not expressly reserve the right to appeal that issue.  Therefore, this court is without jurisdiction to consider that issue.  *See* Fla. R. App. P. 9.140(b)(2)(A)(i); *Davis v. State*, 383 So. 2d 620, 622 (Fla. 1980).

[2] The trial court also found that appellant "conceded that there is historical precedent for law limiting the concealed carry of a firearm."  It appears this language came from the state's response to the motion to dismiss, which claimed: "The defendant concedes there is historical precedent for laws limiting the concealed carry of a firearm."  However, appellant did not make any such concession in his motion to dismiss or during the hearing on the motion.  Rather, appellant consistently maintained that "the statute is not consistent with the nation's historical tradition of firearm regulation."  Significantly, the trial court did not find historical precedent for limiting the concealed carry of firearms for 18- to 20-year-olds, but rather for concealed carry in general.

that denied motion to dismiss, this appeal follows.[3]

## II. Analysis

Appellant argues that the concealed carry statute is unconstitutional under the Second Amendment, as it makes the carrying of a concealed firearm by 18- to 20-year-olds a criminal offense. The Solicitor General, on behalf of the Office of the Attorney General, concedes that appellant's withhold of adjudication for carrying a concealed firearm violates the Second Amendment because appellant is guaranteed a means of public carry under the United States Constitution. The State Attorney's Office filed an amicus brief, arguing that the statute is not unconstitutional because those under 21 were considered minors at the time of our country's founding, and 18- to 20-year-olds are disproportionately responsible for the misuse of firearms.

We review "[a] court's decision regarding the constitutionality of a statute . . . de novo as it presents a pure question of law." *Parkerson v. State*, 163 So. 3d 683, 688 (Fla. 4th DCA 2015) (quoting *State v. Catalano*, 104 So. 3d 1069, 1075 (Fla. 2012)). "For a statute to be held facially unconstitutional, the challenger must demonstrate that no set of circumstances exists in which the statute can be constitutionally applied." *Abdool v. Bondi*, 141 So. 3d 529, 538 (Fla. 2014). In contrast, "[a]n as-applied challenge . . . is an argument that a law which is constitutional on its face is nonetheless unconstitutional as applied to a particular case or party, because of its discriminatory effects . . . ." *Hall v. State*, 319 So. 3d 691, 693 (Fla. 3d DCA 2021) (citation omitted).

This case presents an issue of facial unconstitutionality. *See Worth v. Jacobson*, 108 F.4th 677, 685 (8th Cir. 2024) (analyzing the issue as involving a facial challenge); *accord Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 432 n.5 (3d Cir. 2025); *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583 (5th Cir. 2025); *but see Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1111, 1114 (11th Cir. 2025) (en banc) (using an as-applied analysis). We find the statute in this case to be facially unconstitutional as to 18- to 20-year-olds because "no set of circumstances exists" under this statute that would allow 18- to 20-year-olds to carry a concealed firearm.

Our analysis begins with the statute. Section 790.01, Florida Statutes, as amended on July 1, 2023, allows concealed carry of a firearm without

---

[3] Appellant does not appeal the withhold of adjudication for improper exhibition of a firearm.

a license if an individual otherwise satisfies the requirements for receiving a license:

> (1) A person is authorized to carry a concealed weapon or concealed firearm, as that term is defined in s. 790.06(1), if he or she:
>
> (a) Is licensed under s. 790.06; or
>
> (b) Is not licensed under s. 790.06, but otherwise satisfies the criteria for receiving and maintaining such a license under s. 790.06(2)(a)-(f) and (i)-(n), (3), and (10).
>
> . . . .
>
> (3) Except as provided in subsection (5), a person who does not meet the criteria in subsection (1) and who carries a concealed firearm, as that term is defined in s. 790.001, on or about his or her person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 790.06, Florida Statutes, sets forth the requirements for a license to carry a concealed firearm:

> (2) The Department of Agriculture and Consumer Services shall issue a license if the applicant:
>
> (a) Is a resident of the United States and a citizen of the United States or a permanent resident alien of the United States, as determined by the United States Bureau of Citizenship and Immigration Services, or is a consular security official of a foreign government that maintains diplomatic relations and treaties of commerce, friendship, and navigation with the United States and is certified as such by the foreign government and by the appropriate embassy in this country;
>
> (b) Is *21 years of age or older*;
>
> (c) Does not suffer from a physical infirmity which prevents the safe handling of a weapon or firearm;
>
> (d) Is not ineligible to possess a firearm pursuant to s. 790.23 by virtue of having been convicted of a felony;

4

(e) Has not been:

1. Found guilty of a crime under the provisions of chapter 893 or similar laws of any other state relating to controlled substances within a 3-year period immediately preceding the date on which the application is submitted; or

2. Committed for the abuse of a controlled substance under chapter 397 or under the provisions of former chapter 396 or similar laws of any other state. An applicant who has been granted relief from firearms disabilities pursuant to s. 790.065(2)(a)4.d. or pursuant to the law of the state in which the commitment occurred is deemed not to be committed for the abuse of a controlled substance under this subparagraph;

(f) Does not chronically and habitually use alcoholic beverages or other substances to the extent that his or her normal faculties are impaired. It shall be presumed that an applicant chronically and habitually uses alcoholic beverages or other substances to the extent that his or her normal faculties are impaired if the applicant has been convicted under s. 790.151 or has been deemed a habitual offender under s. 856.011(3), or has had two or more convictions under s. 316.193 or similar laws of any other state, within the 3-year period immediately preceding the date on which the application is submitted;

. . . .

(i) Has not been adjudicated an incapacitated person under s. 744.331, or similar laws of any other state. An applicant who has been granted relief from firearms disabilities pursuant to s. 790.065(2)(a)4.d. or pursuant to the law of the state in which the adjudication occurred is deemed not to have been adjudicated an incapacitated person under this paragraph;

(j) Has not been committed to a mental institution under chapter 394, or similar laws of any other state. An applicant who has been granted relief from firearms disabilities pursuant to s. 790.065(2)(a)4.d. or pursuant to the law of the state in which the commitment occurred is deemed not to have been committed in a mental institution under this paragraph;

(k) Has not had adjudication of guilt withheld or imposition of sentence suspended on any felony unless 3 years have elapsed since probation or any other conditions set by the court have been fulfilled, or expunction has occurred;

(*l*) Has not had adjudication of guilt withheld or imposition of sentence suspended on any misdemeanor crime of domestic violence unless 3 years have elapsed since probation or any other conditions set by the court have been fulfilled, or the record has been expunged;

(m) Has not been issued an injunction that is currently in force and effect and that restrains the applicant from committing acts of domestic violence or acts of repeat violence; and

(n) Is not prohibited from purchasing or possessing a firearm by any other provision of Florida or federal law.

(3) The Department of Agriculture and Consumer Services shall deny a license if the applicant has been found guilty of, had adjudication of guilt withheld for, or had imposition of sentence suspended for one or more crimes of violence constituting a misdemeanor, unless 3 years have elapsed since probation or any other conditions set by the court have been fulfilled or the record has been sealed or expunged. The Department of Agriculture and Consumer Services shall revoke a license if the licensee has been found guilty of, had adjudication of guilt withheld for, or had imposition of sentence suspended for one or more crimes of violence within the preceding 3 years. The department shall, upon notification by a law enforcement agency, a court, or the Florida Department of Law Enforcement and subsequent written verification, suspend a license or the processing of an application for a license if the licensee or applicant is arrested or formally charged with a crime that would disqualify such person from having a license under this section, until final disposition of the case. The department shall suspend a license or the processing of an application for a license if the licensee or applicant is issued an injunction that restrains the licensee or applicant from committing acts of domestic violence or acts of repeat violence.

. . . .

(10) A license issued under this section shall be suspended or revoked pursuant to chapter 120 if the licensee:

(a) Is found to be ineligible under the criteria set forth in subsection (2);

(b) Develops or sustains a physical infirmity which prevents the safe handling of a weapon or firearm;

(c) Is convicted of a felony which would make the licensee ineligible to possess a firearm pursuant to s. 790.23;

(d) Is found guilty of a crime under chapter 893, or similar laws of any other state, relating to controlled substances;

(e) Is committed as a substance abuser under chapter 397, or is deemed a habitual offender under s. 856.011(3), or similar laws of any other state;

(f) Is convicted of a second violation of s. 316.193, or a similar law of another state, within 3 years after a first conviction of such section or similar law of another state, even though the first violation may have occurred before the date on which the application was submitted;

(g) Is adjudicated an incapacitated person under s. 744.331, or similar laws of any other state; or

(h) Is committed to a mental institution under chapter 394, or similar laws of any other state.

. . . .

(16) . . . This section shall be liberally construed to carry out the constitutional right to bear arms. . . .

§ 790.06, Fla. Stat. (2023) (emphasis added). Thus, subsection (2)(b) disqualifies adults aged 18 to 20 from obtaining a concealed carry license and being able to utilize concealed carry as a method of public carry. Further, subsection (16) dictates that we liberally construe the statute in order to carry out the citizenry's constitutional right to bear arms.

When determining if the statute is constitutional, we start with the United States Constitution. But even before the enactment of the Second Amendment, and concurrent with the founding era, Blackstone referred to "the right of having and using arms for self-preservation and defence." 1 William Blackstone, *Commentaries* *140 (1765).

The Second Amendment of the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

A key clause in the Second Amendment is that the people's right to keep and bear arms shall not be "infringed." The definition of "infringe" at the time of the founding is "[t]o violate; to break laws or contracts" or "[t]o destroy; to hinder." Samuel Johnson, *A Dictionary of the English Language* (1773); *see also* William Perry, *The Royal Standard English Dictionary* (1788) (defining "infringe" as "to violate, de[s]troy, hinder"). Because infringement could mean just hindering, total destruction of the right was not required. Merely hindering that right would be sufficient to constitute an infringement. In this case, the inability of law-abiding adults aged 18 to 20 to use concealed carry available to all law-abiding adults 21 and older would certainly classify as a hindrance and, as such, an infringement of their Second Amendment rights.

## A. United States Supreme Court Cases

To help determine the contours of the Second Amendment we look to the four United States Supreme Court cases that have elucidated and defined how we analyze Second Amendment cases. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court determined that the Second Amendment protects an individual's private right to keep and bear arms for self-protection. A District of Columbia handgun ban was held unconstitutional on the ground that it "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Id.* at 628.

In *Heller*, the Supreme Court interpreted "the people" to "unambiguously refer[] to all members of the political community, not an unspecified subset." *Id.* at 580. The Court recognized a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. To "keep" is to "have in custody" or "retain in one's power or possession." *Id.* at 582 (citations omitted). To "bear" means to "carry." *Id.* at 584 (citation omitted). "[A]rms" refers to "[w]eapons of offence, or armour of defence," and extends "to all

instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 581-82 (citation omitted). *Heller* recognized a list of accepted longstanding prohibitions such as "possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places . . . ." *Id.* at 626. *Heller* also generally recognized limitations on the "commercial sale of arms" as well as the "prohibitions on carrying concealed weapons." *Id.* at 626-67.

In *McDonald v. City of Chicago,* 561 U.S. 742 (2010), the United States Supreme Court, through the Fourteenth Amendment, made the Second Amendment applicable to the states. The Supreme Court recognized that the right to keep and bear arms for self-defense was not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id.* at 780.

The United States Supreme Court extended the reach of the Second Amendment from an individual's residence in order to "protect an individual's right to carry a handgun for self-defense outside the home" in *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 10 (2022). The Supreme Court stated that the following test would determine if the firearm regulation at issue violated the Second Amendment. First, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If it does, then "the constitution presumptively protects that conduct." *Id.* Second, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "[T]he government may not simply posit that the regulation promotes an important interest." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

Whether there is a historical regulation that is a sufficient analogue for a modern firearm regulation requires a "determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28-29. As part of this determination, the court considers "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The present-day regulation need not be a "dead ringer for historical precursors," but must be "analogous enough to pass constitutional muster." *Id.* at 30.

In *Bruen,* the petitioners were "law-abiding, adult citizens" who applied for an unrestricted license to carry a firearm for self-defense. *Id.* at 15. In both cases, the law-abiding adult citizens received restricted licenses that either restricted carry in areas frequented by the public or limited to "carry to and from work." *Id.* at 16. These applicants were "part of 'the people'

whom the Second Amendment protects." *Id.* at 31-32. Additionally, the "definition of 'bear' naturally encompasses public carry." *Id.* at 32.

As to historical method, the Supreme Court "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. By reviewing the historical analogues, the Court determined that "the historical record . . . [did] not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 38. However, states could, as to all law-abiding adults, "eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Id.* at 59. The Supreme Court concluded, as to the adult law-abiding applicants for an unrestricted license to carry a firearm, that the government had "not met their burden to identify an American tradition justifying the . . . proper-cause requirement" utilized by the State of New York. *Id.* at 70.

Recently, in *United States v. Rahimi*, 602 U.S. 680, 690 (2024), the United States Supreme Court upheld a federal statute that prohibited individuals subject to a domestic violence restraining order from possessing a firearm where the restraining order contained findings that the individual posed a credible threat to the physical safety of their partner. The Court stated that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* The Court relied on the fact that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 693.

*Rahimi* discussed the historical background in which groups of people were no longer subject to being disarmed. *Rahimi* pointed to prior English law which allowed the disarming of certain groups, including brigands and highwaymen, political opponents, and disfavored religious groups. *Id.* at 694. "By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents." *Id.* "But regulations targeting individuals who physically threatened others persisted." *Id.* The laws banning guns by a category of persons who "present a special danger of misuse . . . appl[y] only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 698-99. The Court significantly noted that the statute in this case did "not broadly restrict arms use by the public generally." *Id.* at 698. The restriction applied only where there was evidence that the individual banned was a "credible

10

threat" to the physical safety of another. *Id.* at 700. The Court rejected the theory that an individual, and thus a group of individuals, could be subject to being disarmed "simply because he is not 'responsible.'" *Id.* at 701.

### B. Federal Circuit Court Cases

Federal circuit courts have dealt with the issue of whether 18- to 20-year-olds can be prohibited from carrying firearms in the same manner as other adults. In *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024), the Eighth Circuit struck down a Minnesota law that prohibited 18- to 20-year-olds from the public carry of handguns. The permit to carry included both open as well as concealed carry of a handgun. The Eighth Circuit found that "the people" included "[o]rdinary, law-abiding, adult citizens that are 18 to 20-year-olds." *Id.* at 689. Additionally, the state did not offer any founding-era analogues to demonstrate the history and tradition of the public carry ban geared towards 18- to 20-year-olds. *Id.* at 695-96.

In the same vein, *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), also invalidated statutes that banned 18- to 20-year-olds from carrying firearms outside their homes during a state of emergency. The Third Circuit found that "[t]he Second Amendment's reference to 'the people' covers all adult Americans." *Id.* at 435. The court further found that "[f]ounding-era laws reflect the principle that 18-to-20-year-olds are 'able-bodied men' entitled to exercise the right to bear arms." *Id.* at 441.

### C. *McDaniels v. State*, 419 So. 3d 1180 (Fla. 1st DCA 2025)

Appellant, as conceded by the Office of the Attorney General, had no lawful means to exercise his right to public carry on the day of his arrest because he could not carry the firearm, either concealed or openly. We acknowledge that after appellant was arrested, the First District concluded in *McDaniels v. State*, 419 So. 3d 1180 (Fla. 1st DCA 2025), that Florida's open carry law was unconstitutional in violation of the Second Amendment. The *McDaniels* court also correctly recognized that the intermediate scrutiny test, as applied in *Norman v. State*, 215 So. 3d 18 (Fla. 2017), no longer provides "controlling precedent" because *Bruen* rejected that analysis incorporated in *Norman.* 419 So. 3d at 1188.

The holding in *McDaniels* relates to a violation of open carry. Because appellant was not charged with open carry, anything we opine on that particular statute would be dicta. *See Parrish v. State*, 331 So. 3d 161, 166 (Fla. 4th DCA 2021) ("[A] remark made in pronouncing an opinion and

which concerns some rule, principle or application of law not necessarily involved in the case or essential to its determination is obiter dictum" and "has no precedential value.") (citation and emphasis omitted). The Attorney General's argument that its office will no longer defend prosecutions under the open carry statute, as set forth in its "guidance memorandum," does not change the fact that section 790.053 is still a current statute that remains presently valid and potentially enforceable in this district. *See State v. Hayes*, 333 So. 2d 51, 53 (Fla. 4th DCA 1976) ("[A]s between District Courts of Appeal, a sister district's opinion is merely persuasive.").[4]

Because appellant had no lawful way to public carry, the conviction for concealed carry should be vacated, as conceded by the Office of the Attorney General. But our analysis does not end there because this statute abridging rights to concealed carry, as one of the manners of public carry, extends to all 18- to 20-year-olds—not just appellant. When considering the text of the Second Amendment and caselaw from the United States Supreme Court, starting with *Heller*, *McDonald*, and *Bruen*, and ending with *Rahimi*, as well as the circuit cases of *Worth* and *Lara*, we find that this statutory scheme violates 18- to 20-year-olds' Second Amendment rights.

## D. *Bruen* Application: Plain Text of Second Amendment

Based on the framework in *Bruen*, we must first determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If so, then "the Constitution presumptively protects that conduct." *Id.* Initially, the right to "keep and bear arms" encompasses the right to the public carry of a firearm. *Id.* at 32-33; *Heller*, 554 U.S. at 592. Additionally, 18- to 20-year-olds are part of "the people" referred to in the Second Amendment. The term "the people" refers to all "members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* also referred to "the people" as "law-abiding, responsible citizens."

---

[4] We need not address the "fundamentally distinct" differences between open carry and concealed carry as discussed in *McDaniels*, 419 So. 3d at 1193. In the present case, appellant was charged with carrying a concealed firearm and could not obtain a concealed carry permit exclusively due to his age. Appellant was potentially subject to an open carry prosecution and, thus, could not public carry. Further, even if open carry was not a possible future charge, as argued by the Attorney General, appellant and all those aged 18 to 20 are not able to avail themselves of the same concealed carry permit available to all other law-abiding adults. Additionally, none of the analogues discussed in *McDaniels* regarding concealed carry address the issue in this case: the right of 18- to 20-year-old adults to the same Second Amendment rights as other law-abiding adults.

*Id.* at 635. In *Bruen*, the Court reiterated that "ordinary, law-abiding, adult citizens . . . are part of 'the people' whom the Second Amendment protects." 597 U.S. at 31-32. The Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *McDonald*, 561 U.S. at 780.

Federal circuit courts have also specifically referenced those aged 18 to 20 as being part of "the people." *Worth*, 108 F.4th at 689; *Lara*, 125 F.4th at 438; *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 590-95 (5th Cir. 2025). Even when the Eleventh Circuit upheld restrictions on the purchase of firearms, it still found 18- to 20-year-olds to be part of "the people." *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025) (en banc).

In *Worth*, the Eighth Circuit concluded:

> Ordinary, law-abiding, adult citizens that are 18 to 20-year-olds are members of the people because: (1) they are members of the political community under *Heller*'s "political community" definition; (2) the people has a fixed definition, though not fixed contents; (3) they are adults; and (4) the Second Amendment does not have a freestanding, extratextual dangerousness catchall.

108 F.4th at 689.

The Eighth Circuit recognized 18- to 20-year-olds as being "among 'the people' for other constitutional rights such as the right to vote, freedom of speech, peaceable assembly, government petitions, and the right against unreasonable government searches and seizures." *Id.* at 691 (citation omitted). The court was not persuaded by a "claim that a group," such as 18- to 20-year-olds, was "irresponsible" or "dangerous," or that such a claim removed them from being part of "the people." *Id.* at 692. The court recognized that the plain text of the Second Amendment did not per se "have an age limit." *Id.*

In *Lara*, the Third Circuit also found the reference to "the people" included "all adult Americans." 125 F.4th at 435. The Third Circuit stated that "the people" does not mean not including those who were excluded at the founding, or "'the people' would consist solely of white, landed men, and that is obviously not the state of the law." *Id.* at 437. "18-to-20-year-olds are, like other subsets of the American public, presumptively among 'the people' to whom Second Amendment rights extend." *Id.* at 438.

As the Fifth Circuit in *Reese* explained: "[T]he phrase 'right of the people' appears in the First Amendment's Assembly-and-Petition Clause, the Fourth Amendment's Search-and-Seizure Clause, and the Ninth Amendment." 127 F.4th at 591. "All of these references confer 'individual rights' and undoubtedly protect eighteen-to-twenty-year-olds as much as twenty-one-year-olds." *Id.* "[I]n all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* (quoting *Heller*, 554 U.S. at 580). "[T]o say that 'the people' covered by the Second Amendment is limited to those who were a part of the 'political community' at the founding would imply excluding 'law-abiding, adult citizens' based on property ownership, race, or gender." *Id.* at 592 (emphasis omitted). "Just as defining 'arms' as 'only those arms in existence in the 18th century' 'border[s] on the frivolous,' likewise, attempting to limit 'the people' to individuals who were part of the 'political community' at ratification is ludicrous." *Id.* at 593.

Further, our founders recognized that the right to keep and bear arms was an integral part of the rights of all citizens. In *The Federalist Papers*, James Madison described the militia, which those at 18 were required to join, as "amounting to near half a million of citizens with arms in their hands . . . ." *The Federalist No. 46*, at 299 (James Madison) (Clinton Rossiter ed., 1961). From the time of the founding, the political community references those who are part of the "law-abiding, responsible citizen[ry]." *Heller*, 554 U.S. at 635.

Thus, the plain text of the Second Amendment covers the right of 18- to 20-year-olds to the public carry of firearms, which would include concealed carry as a manner of public carry.

### E. *Bruen* Application: Historical Tradition

Because the Second Amendment presumptively protects the right of 18- to 20-year-olds to the public carry of firearms, which includes concealed carry, then the burden shifts to the state to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. This burden has not been met here. After considering the "how and why" of this regulation, we find that it impermissibly burdens the right of 18- to 20-year-olds to armed self-defense. A categorical ban on adults aged 18 to 20 who are part of "the people," "the how," is not consistent with the history and tradition of firearm regulations. As to the "why," no historical analogues provided categorically prohibit the public carry, including concealed carry, of firearms for self-defense for those aged 18 to 20, who are a subset of all

adults.

"[I]t is the task of the judge in this generation to discern how the framers' values, defined in the context of the world they knew, apply to the world we know. The world changes in which unchanging values find their application." *Ollman v. Evans*, 750 F.2d 970, 995 (D.C. Cir. 1984) (Bork, J., concurring). So it is with the Second Amendment. The framers defined adulthood as starting at age 21, *see Bondi*, 133 F.4th at 1117 ("At the Founding, a person was an 'infant[ ]' or a 'minor[ ]' in the eyes of the law until age 21.") (citation omitted), but the definition and understanding of adulthood changed in the present world to be understood as starting at 18. We know from section 743.07, Florida Statutes (2023), which sets the age of majority at 18 years of age or older, the right to vote sanctified as the Twenty-Sixth Amendment, and the general understanding in our present world, that 18 is the age used to mark passage into adulthood.

We do not define adults today as starting at age 21 like adulthood was defined at the time of the founding. We define adulthood today in "the world we know." *Ollman*, 750 F.2d at 995 (Bork, J., concurring). Similarly, we do not define weapons of self-defense as being limited to muskets or firelocks. As *Heller* explained, such an argument borders on "frivolous" because "[w]e do not interpret constitutional rights that way." 554 U.S. at 582. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (citations omitted). Thus, just as the definition of "arms" has changed over time, so too has the definition of majority or the age commencing adulthood.

"Eighteen-to twenty-one-year-olds in Florida today—in other words, adults—are analogous to legal adults at the time of the Founding, not legal minors. The Constitution's protections are not limited to those persons who are older than the most common age of majority in the 1700s." *Bondi*, 133 F.4th at 1180 (Brasher, J., dissenting). "[I]n Florida today," 18- to 20-year-olds are defined by statute as being adults. *See* § 743.07(1), Fla. Stat. (2023) ("The disability of nonage is hereby removed for all persons in this state who are 18 years of age or older, and they shall enjoy and suffer the rights, privileges, and obligations of all persons 21 years of age or older . . . .").

We find *Worth* and *Lara* especially instructive. As previously noted, *Worth* struck down a law prohibiting 18- to 20-year-olds from publicly carrying handguns, both openly and concealed. 108 F.4th 677. In *Worth*,

the court found no founding-era analogues to support a carry ban on 18- to 20-year-olds. *Id.* at 696. The court recognized that *Heller* did not include 18- to 20-year-olds on the list of longstanding prohibitions that were presumptively lawful. *Id.* at 698. Eighteen- to 20-year-olds are not "comparable to the mentally ill." *Id.*

Similarly, in *Lara*, which invalidated statutes banning 18- to 20-year-olds from carrying firearms outside their homes during a state of emergency, the court concluded that "[f]ounding-era laws reflect the principle that 18-to-20-year-olds are 'able-bodied men' entitled to exercise the right to bear arms." 125 F.4th at 441. The court looked to the Second Militia Act, passed in 1792, a mere five months after the ratification of the Second Amendment, to demonstrate that "all able-bodied men" were required "to enroll in the militia and to arm themselves upon turning 18." *Id.* at 443. "That young adults had to serve in the militia indicates that founding-era lawmakers believed those youth could, and indeed should, keep and bear arms." *Id.* at 444. The court concluded that "the Second Militia Act is good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed," and further found that no "founding-era statute impos[ed] restrictions on the freedom of 18-to-20-year-olds to carry guns." *Id.*

It is true that "longstanding prohibitions on the possession of firearms" have been presumptively applied to certain subsets of adults, such as felons and the mentally ill. *Heller*, 554 U.S. at 626-27. Prohibitions on carrying firearms into sensitive areas, as well as prohibitions on carrying concealed weapons, were also recognized as presumptively lawful in *Heller*. *Id.* at 626. *Bruen* recognized that "[s]tates could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." 597 U.S. at 59.

However, the regulation here does not apply to all adults, but rather to just a subset of adults who are part of "the people" and, thus, entitled to the same Second Amendment rights as all law-abiding adults. The entire focus of that part of the statute is on regulating based solely on the age of those asserting their Second Amendment rights, and not on the particular action or manner of public carry being regulated. In other words, the thrust of the regulation is on age and not on the manner of carry, that being concealed carry. After all, all other adults 21 and older are eligible for concealed carry. As *Rahimi* stated: "Even when a law regulates arms-bearing for a permissible reason," such as concealed carry, the permissible restriction "may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding." 602 U.S. at 692.

16

That is exactly what is being done here.

Nowhere does the list of presumptively lawful prohibitions mention those aged 18 to 20 years old. *See Worth*, 108 F.4th at 698. Obviously, 18- to 20-year-olds are not "comparable to the mentally ill." *Id.* Nor do 18- to 20-year-olds evince, as a group, "a clear threat of physical violence to another." *Rahimi*, 602 U.S. at 698. We cannot deem a subset or category of people as dangerous based solely on rank belief. *Worth*, 108 F.4th at 694. No historical analogue presented would place 18- to 20-year-olds in the same category as felons, the mentally ill, or domestic violence offenders.

The amicus brief by the State Attorney's Office attempts to justify the "why" of this regulation by relying on case law from other circuits that have upheld prohibitions on 18- to 20-year-olds purchasing firearms. *See Bondi*, 133 F.4th 1108 (finding that a Florida law prohibiting the purchase of firearms by 18- to 20-year-olds did not violate the Second Amendment); *McCoy v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 140 F.4th 568 (4th Cir. 2025) (upholding a federal law prohibiting the commercial sale of handguns to 18- to-20-year-olds). However, these cases do not concern the right of adults aged 18 to 20 to keep and bear arms for self-defense, but rather address whether young adults can purchase firearms. Consequently, these cases are distinguishable.

In *Bondi*, the majority concluded that "[f]ounding-era law precluded individuals under the age of 21 from purchasing arms because they lacked cash and the capacity to contract." 133 F.4th at 1123. Thus, this case's holding is about the authority of young adults to contract to purchase a firearm, not the right to keep and bear arms. The fact that 18- to 20-year-olds were considered minors at the time of the founding, for the purpose of executing contracts, does not diminish their rights to keep and bear arms under the Second Amendment. Even the majority in *Bondi* conceded that "[f]ounding-era laws required minors [aged 18 to 20] to carry arms for militia service" and that "states required their parents to provide the arms." *Id.*

The amicus brief also relies on the alleged disproportionate misuse of firearms committed by 18- to 20-year-olds. These justifications do not respond to the test required for our analysis, that being the history and tradition of firearm regulation. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The amicus fails to meet this standard. Further,

17

*Rahimi* rejected the notion that an individual "may be disarmed simply because he is not 'responsible.'" 602 U.S. at 701. It goes without saying that a subset of adults aged 18 to 20 cannot be uniformly disarmed simply because they are alleged to be not "responsible."

We conclude that all those in the age of majority have the same rights to public carry, which includes the right to concealed carry. "A judge who refuses to see new threats to an established constitutional value, and hence provides a crabbed interpretation that robs a provision of its full, fair and reasonable meaning, fails in his judicial duty." *Ollman*, 750 F.2d at 996 (Bork, J., concurring). That duty, it is worth repeating, "is to ensure that the powers and freedoms the framers specified are made effective in today's circumstances." *Id.* Finding that weapons covered by the Second Amendment include only muskets or firelocks, or that 18- to 20-year-olds are "infants," or minors, would suffer from the same "crabbed interpretation" rejected by *Heller*.

All those who reach the age of 18 are able, and encouraged, for example, to join the military to defend our country. Yet those very same law-abiding adults are burdened in their ability to exercise the same Second Amendment rights that other adults have. Eighteen- to 20-year-olds can defend the country without restriction but can only utilize their Second Amendment right to self-defense with severe restrictions. This burden on law-abiding 18- to 20-year-olds' right to public carry—and specifically here concealed carry—which is not applicable to any other adults, is a burden that is facially unconstitutional as to 18- to 20-year-olds.

### III. Conclusion

In conclusion, we find that section 790.06(2)(b) is facially unconstitutional as it applies to people aged 18 to 20, as it is contrary to our historical tradition and violates the Second Amendment. As such, we vacate appellant's conviction for concealed carry of a firearm.

*Reversed and remanded with instructions.*

KUNTZ, C.J., and SHAW, J., concur.

\*　　　\*　　　\*

**Not final until disposition of timely-filed motion for rehearing.**

18